IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

DOUGLAS D. FLIPPO,                          )
                                            )
                    Plaintiff,              )
                                            )
vs.                                         )        Case No. 07-3461-CV-W-ODS
                                            )
MICHAEL J. ASTRUE,                          )
Commissioner of Social Security,            )
                                            )
                    Defendant.              )

ORDER AND OPINION AFFIRMING
COMMISSIONER'S FINAL DECISION DENYING BENEFITS

        Pending is Plaintiff's request for review of the final decision of the Commissioner
of Social Security denying his application for Supplemental Security Income benefits.
The Commissioner's decision is affirmed.


I.  BACKGROUND


        Plaintiff was born in August 1964, has completed high school, and has prior work
experience as a grinder.  This is his third application for benefits: his first two were filed
in February 1997 and April 2002, and were denied in January 1998 and March 2005.  In
this application, Plaintiff originally alleged an onset date of August 15, 1996, but the ALJ
declined to reopen the prior cases.  Therefore, Plaintiff's alleged onset date is April 5,
2005 (the date he filed the instant application).
        Plaintiff's claim initially centered around both physical and mental/psychological
ailments, but on appeal he has focused on the latter.  Therefore, while some aspects of
Plaintiff's physical condition will be mentioned, the Court will focus on the
mental/psychological issues.
        Plaintiff has been treated by Dr. Paul Glynn.  On April 29, 2005 – Plaintiff's first
visit to Dr. Glynn after the alleged onset date – Plaintiff reported pain in his body and

difficulty bending over. Dr. Glynn also wrote that Plaintiff "may have sleep disorder – it is difficult for him to describe his problems" and determined Plaintiff was suffering from anxiety. R. at 348. On May 27, Plaintiff complained of severe headaches. He reported Kadian (a morphine-based medication prescribed for chronic pain) helped but that he woke up in the early morning with pain and felt nervous all the time. R. at 348. On June 28, Plaintiff reported pain "all over body" and told Dr. Glynn that seroquel (a mood stabilizer) was helping. Dr. Glynn noted Plaintiff had an upcoming appointment with a neurologist, but indicated Plaintiff's MRI did not show "anything that is correctable." R. at 347. Plaintiff returned monthly for the rest of the year, complaining of back pain. R. at 344-45.

In June 2005, Plaintiff was examined by David Lutz, Ph.D., on referral by the state agency. Dr. Lutz had seen Plaintiff in November 2002 in connection with his previous application for benefits. Based on his (admittedly limited) past experience with Plaintiff, Dr. Lutz questioned Plaintiff's credibility. Nonetheless, he concluded Plaintiff suffered from dysthymic disorder, antisocial and narcissistic characteristics, and personality disorder, and assessed Plaintiff's GAF score at 55. He also opined Plaintiff could "understand and remember simple and moderately complex instructions, . . . sustain concentration and persistence on simple and moderately complex tasks, . . . . interact in moderately demanding social situations [and] adapt to his environment." He determined Plaintiff was likely limited in his ability to understand and remember complex instructions and sustain concentration on complex tasks. R. at 257-62.

In July 2005, Geoffrey Sutton, Ph.D., a psychologist from the state agency, reviewed the record and completed a Psychiatric Review Technique Form ("PRTF") indicating Plaintiff suffered from mild to moderate limitations. He also concluded Plaintiff suffers from depression and required work that was not complex. R. at 264-76.

In December 2005, Dr. Glynn filled out a Medical Source Statement - Physical ("MSS-P") and a Medical Source Statement - Mental ("MSS-M"). On the latter form, Dr. Glynn indicated Plaintiff was extremely limited in his ability to work with others, interact with the public, complete a normal workday and workweek without interruption, accept instructions and criticism, respond to changes in the work setting, or set goals or make

2

plans independent of others. He also indicated Plaintiff was markedly limited in his ability to understand and remember detailed instructions, maintain attention and concentration for extended periods of time, perform activities within a schedule or sustain an ordinary routine. R. at 299-300. Dr. Glynn supplemented the MSS-M with a letter clarifying that the answers on the form came from Plaintiff and not Dr. Glenn; the doctor "help[ed] him understand what was being asked in many cases" and recorded Plaintiff's answers, but did not purport to offer his own opinions on the questions asked. Dr. Glenn closed his letter by opining "that in addition psychological impairments [Plaintiff] may well have neurological impairments, resulting from head injuries suffered during physical abuse as a child." R. at 353. The MSS-P indicated Plaintiff could carry less than five pounds frequently and ten pounds occasionally, walk or stand for thirty minutes at a time and two hours total in a day, sit for thirty minutes at a time and two hours total in a day, and needed to lie down once a day for four hours. Dr. Glynn also indicated Plaintiff could never stoop, kneel, crouch, crawl, handle objects, or balance, and his ability to push or pull was subject to the same weight limitations ascribed for lifting. R. at 296-97.

Plaintiff saw Dr. Glynn monthly from January 2006 to December 2006 for treatment of anxiety, back pain, neck pain, or some combination thereof. Dr. Glynn's contemporaneous notes do not reflect any particular diagnosis, nor do they reflect any testing; he simply refilled Plaintiff's medication. R. at 337-43. Nonetheless, in May 2006, Dr. Glynn wrote a letter indicating Plaintiff's "history includes severe physical abuse and closed lucid injury on several occasions as a child. . . . He states he has always felt depressed, does not make friends, and has had episodes of auditory hallucinations or 'voices.' . . . . I do feel he has neurological impairments in higher functions, a result of multiple closed head injuries and PTSD." R. at 288. However, the Record does not contain any testing that confirms this assessment, and Dr. Glynn closed his letter by suggesting Plaintiff needed to undergo a neuro-psychological evaluation. Plaintiff had a neurological examination in May 2003; the results were

Case 6:07-cv-03461-ODS   Document 13   Filed 12/17/08   Page 3 of 8

normal.  R. at 358-78.  Dr. Glynn does not reference them, perhaps because he did not know about them.[1]

In June 2006, Plaintiff saw Joan Bender, Ph.D., for a psychological evaluation in connection with this benefit application.  She opined that Plaintiff suffers from, among other things, schozoaffective disorder, posttraumatic stress disorder, intermittent explosive disorder, and borderline intellectual functioning.  Dr. Bender assessed Plaintiff's GAF score at 30.  R. at 323-26.

Plaintiff testified that he is nervous around people, R. at 408-09, is depressed, R. at 413, and does not like interacting with people and sometimes becomes violent.  R. at 414-15.  Plaintiff also testified that he is in excruciating pain that limits him to standing or walking for twenty minutes, sitting for fifteen minutes, and experiences shortness of breath that limits him to ten minutes of activity before he must rest.  R. at 411-13, 415.

The ALJ elicited testimony from a Vocational Expert ("VE").  In the first hypothetical, the VE was asked to assume a person of Plaintiff's age, education and experience who suffered from degenerative disc disease, dysthymic disorder, "a disorder of written expression," and somatoform and personality disorders.  The individual was also limited to lifting twenty pounds occasionally and ten pounds frequently, standing or walking six hours a day, and sitting six hours a day.  Finally, the individual also required work with simple instructions that involved repetitive work and did not involve customer service or any other contact with the public or writing beyond "simple rote words used with checkmarks and signature."  The VE Testified such an individual could perform some light unskilled work, such as housekeeper, kitchen helper and packager.  R. at 419-22.  When asked to assume the limitations contained in Dr. Bender's report, the VE testified such an individual could not perform work.  R. at 422-

---

[1]Plaintiff saw Dr. Glynn only sporadically before 2005.  According to the ALJ's opinion in Plaintiff's last application, Plaintiff saw Dr. Glynn in January 2003, missed his appointment for March 2003, and did not see Dr. Glynn again until March 2004.  R. at 47-48.  At that time, Dr. Glynn "suggested the possibility of a severe mental disorder, but the claimant has received no treatment by a mental health professional."  R. at 48.

4

23.  The VE gave a similar answer when asked to consider Dr. Glynn's MSS-M and MSS-P.  R. at 423.

The ALJ found Plaintiff's testimony to not be entirely credible.  With respect to Plaintiff's physical condition, the ALJ noted the absence of any objective medical basis for the degree of pain and resulting limitations and Plaintiff's daily activities (which included household chores with no limitations, part-time jobs, yard work, and caring for his grandmother).  R. at 24-25.  The ALJ also noted Plaintiff's poor work history, and the fact that Plaintiff was "$30,000 in arrears for child support and was ordered by a court to work unless he is on disability," which suggested a lack of motivation to work.  R. at 25-26.

With respect to Plaintiff's mental/psychological condition, the ALJ rejected Dr. Glynn's MSS-M because Dr. Glynn "does not have the history of the claimant's multiple psychological evaluations (including neuropsychological)."  R. at 27.  He rejected Dr. Bender's opinions because she had "no records; therefore, her opinion is based primarily on the subjective statements of the claimant, rather than objective tests or findings."  In fact, her conclusions were contrary to those of experts who had access to such data.  R. at 27.  The ALJ acknowledged Dr. Lutz, like Dr. Bender, examined Plaintiff only once in connection with this application.  However, Dr. Lutz' "opinion is consistent with the objective medical evidence and the record as a whole."  R. at 28.  The ALJ found Plaintiff was limited in the manner set forth in his first hypothetical question to the VE and denied his application for benefits.

## II.  DISCUSSION

"[R]eview of the Secretary's decision [is limited] to a determination whether the decision is supported by substantial evidence on the record as a whole.  Substantial evidence is evidence which reasonable minds would accept as adequate to support the Secretary's conclusion.  [The Court] will not reverse a decision simply because some evidence may support the opposite conclusion."  Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994) (citations omitted).  Though advantageous to the Commissioner, this

Case 6:07-cv-03461-ODS   Document 13   Filed 12/17/08   Page 5 of 8

standard also requires that the Court consider evidence that fairly detracts from the final decision. Forsythe v. Sullivan, 926 F.2d 774, 775 (8th Cir. 1991) (citing Hutsell v. Sullivan, 892 F.2d 747, 749 (8th Cir. 1989)). Substantial evidence means "more than a mere scintilla" of evidence; rather, it is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Smith v. Schweiker, 728 F.2d 1158, 1161-62 (8th Cir. 1984).

Plaintiff's primary argument involves the ALJ's decision to reject Dr. Glynn's opinions regarding Plaintiff's mental/psychological limitations.[2] Generally speaking, a treating physician's opinion is entitled to deference. This general rule is not ironclad; a treating physician's opinion may be disregarded if it is unsupported by clinical or other data or is contrary to the weight of the remaining evidence in the record. E.g., Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996). Here, there are abundant reasons supporting the ALJ's decision. Most notably, Dr. Glynn's letter explaining the MSS-M demonstrates the information contained on the form is not Dr. Glynn's opinion: he merely recorded Plaintiff's answers to the questions. In light of this fact, it is hard to characterize the MSS-M as Dr. Glynn's opinion in the first place. Compounding the limited value of the report is (1) Dr. Glynn's lack of objective testing or other supportive data and (2) his declaration that additional testing was required. Finally, while Dr. Glynn described Plaintiff as "unemployable," this opinion is not binding because (1) it was based on the information in the MSS-M and (2) it is not a medical opinion, so no deference is due in any event.

Plaintiff attempts to buttress Dr. Glynn's conclusions by pointing to opinions of consulting opinions submitted in connection with Plaintiff's prior applications. Those opinions relate to a time period different than the one at issue and are not conclusive. More importantly, they are not as supportive as Plaintiff suggests, and are actually more consistent with Dr. Lutz' June 2005 opinion. For instance, in May 2003 Dr. Dale

---

[2]As noted earlier, the Court has not attempted to summarize all of the evidence regarding Plaintiff's physical condition. It is sufficient to observe the ALJ's decision in this regard is supported by substantial evidence in the record as a whole. See R. at 19 (listing objective tests on Plaintiff's back).

6

Halfaker, Ph.D., administered multiple tests to Plaintiff and his ultimate opinions are very similar to Dr. Lutz' (including a GAF assessment of 58). They are also very similar to the limitations described in the ALJ's hypothetical question to the VE. R. at 358-78. In September 2004, Dr. Eva Wilson found Plaintiff "is capable of understanding and remembering simple, semicomplex, and complex instructions. I am afraid, however, that [he] is incapable of sustaining concentration and persistence with anything other than simple tasks at this time because of his depression." She also indicated Plaintiff had a GAF score of 50 to 60. R. at 311-14.

The only opinion supportive of Dr. Glynn's MSS-M is Dr. Bender's report. However, given that Dr. Glynn's MSS-M does not contain *his* opinion, nothing Dr. Bender can say would compel the ALJ to accept the MSS-M. Viewed on its own, there are valid reasons supporting the ALJ's decision not to rely upon Dr. Bender's report. As a consultant, she lacked a treating relationship with Plaintiff and saw him on only one occasion. She did not have access to Plaintiff's records, and formed an opinion based entirely on what he told her. While Dr. Lutz was also a consultant, he had access to Plaintiff's records. In any event, the ALJ was not obligated to accept Dr. Bender's opinion over Dr. Lutz'. Given the state of the Record, the Court cannot conclude the ALJ erred, and there is substantial evidence to support the final decision.

Plaintiff next faults the ALJ for failing to account for Plaintiff's limitations, "specifically his inability to get along with the general public, and his co-workers." Plaintiff's Brief at 17. The Record reveals otherwise. R. at 420.

Finally, Plaintiff argues the VE's testimony should not have been accepted because of differences between the VE's testimony about the jobs in question and the information contained in the Dictionary of Job Titles ("DOT"). In large measure, Plaintiff's argument depends on a decision that finds inadequacies in the ALJ's hypothetical questions. Finding none, there can be no error in accepting the VE's testimony. Moreover, relevant differences between the VE's testimony and the DOT entries were discussed. R. at 421-22, 424-25.

7

## III.  CONCLUSION

The Commissioner's decision is supported by substantial evidence in the record as a whole, and it is affirmed.

IT IS SO ORDERED.

/s/ Ortrie D. Smith

ORTRIE D. SMITH, JUDGE

DATE: December 17, 2008 UNITED STATES DISTRICT COURT